Jess AYLETT and Barbara
Aylett, Petitioners,

v.

SECRETARY OF HOUSING AND UR-
BAN DEVELOPMENT, on behalf
of Bobbie Burris, Respondent,

and

Bobbie Burris, Intervenor.

No. 94–9516.

United States Court of Appeals,
Tenth Circuit.

May 25, 1995.

Larry S. Jenkins of Wood Spendlove & Quinn, L.C., Salt Lake City, UT, (Kathryn O. Balmforth, with him on the brief), for petitioner.

Mary K. McElderry of the Dept. of Justice, Washington, DC (David K. Flynn, Dept. of Justice, and Deval L. Patrick, Asst. U.S. Atty., with her on the brief), for respondent.

Judith A. Browne of the NAACP Legal Defense and Educational Fund, Inc., Washington, DC (Penda D. Hair of the NAACP Legal Defense and Educational Fund, Inc., Washington, DC, and Kevin S. Reed, NAACP Legal Defense and Educational Fund, Inc., Los Angeles, CA, with her on the brief), for intervenor.

Before SEYMOUR, ALDISERT *, and BALDOCK, Circuit Judges.

ALDISERT, Senior Circuit Judge.

 This is a petition for review by a white couple, Jess and Barbara Aylett, from a decision and final order by the Secretary of the U.S. Department of Housing and Urban Development (HUD), imposing damages against them in excess of $100,000 for allegedly discriminatory statements made by the Ayletts against an African–American woman seeking to rent an apartment unit from them. Although the petition requires us to determine whether substantial evidence on the record as a whole supports the Secretary's order, the decision is subject to "heightened scrutiny" where, as in this case, the Secretary has rejected the hearing officer's credibility findings. *Fierro v. Bowen,* 798 F.2d 1351, 1355 (10th Cir.1986), *cert. denied,* 480 U.S. 945, 107 S.Ct. 1602, 94 L.Ed.2d 789 (1987). We hold that the Secretary's rejection of the ALJ's credibility findings does not pass the heightened scrutiny test and accordingly grant the petition for review.

Jurisdiction properly lies in this court. The Secretary filed a charge of discrimination pursuant to 42 U.S.C. § 3610(g), accusing Jess and Barbara Aylett, and their son William Justin Memmott, of violating the Fair Housing Act, 42 U.S.C. § 3604(b), (c).

A one-day trial was held before an ALJ pursuant to 42 U.S.C. § 3612. The Secretary entered a final order against the Ayletts and they filed a timely petition for review pursuant to 42 U.S.C. § 3612(i). We have jurisdiction pursuant to 28 U.S.C. § 2342(6).

As previously suggested, we must sustain an administrative agency's decision if it is supported by "substantial evidence," which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fierro,* 798 F.2d at 1355 (quotation omitted). However, "where the Secretary . . . overturns a decision of the ALJ . . . and, in doing so, differs with the ALJ's assessment of witness credibility, the Secretary should fully articulate his reasons for so doing, and then, with heightened scrutiny, we must decide whether such reasons find support in the record." *Id.* (citations omitted).

I.

In August 1990, Bobbie Burris, a black woman and intervenor in this action, learned that a rental apartment unit managed by Jess Aylett and located in Sandy, Utah was available. Because Ms. Burris was receiving HUD rent subsidies that required inspection of any proposed rental unit, as well as the completion of certain forms, Ms. Burris telephoned Mr. Aylett and asked if he accepted Section 8 subsidy vouchers. Jess Aylett responded that he did, that the rent was $400 per month, and that a $200 deposit was required. He instructed Ms. Burris to come by the house and drop off the papers, although he did not mention this matter to his wife.

When Ms. Burris came to the Aylett residence with the documents, Mr. Aylett was not home. Ms. Aylett invited Ms. Burris into the house, along with Ms. Burris' 21–year–old daughter and granddaughter. The daughter and granddaughter remained in the Aylett home briefly, then waited in the car. Ms. Aylett signed the required forms and spoke with Ms. Burris for about an hour, primarily in the kitchen. Midway through

---

* Ruggero J. Aldisert, Senior Judge for the United States Court of Appeals for the Third Circuit, sitting by designation.

their friendly conversation, the two women discovered they were classmates in high school. Some of Ms. Aylett's children, including her son Justin Memmott, were home during Ms. Burris' visit and wandered in and out of the kitchen while the two women were talking.

During the conversation, one of the women apparently raised the issue of race. It is undisputed that Ms. Aylett informed Ms. Burris that she and her husband had let premises to black renters from "back East" (New Jersey) in the past. After the visit had ended and the parties were saying goodbye at the front door, Ms. Burris alleges that Ms. Aylett told her "out of the blue" that "My husband will never rent to a Black person," but that she would put in a good word for Ms. Burris.

Ms. Aylett denies making this statement and her son, Justin Memmott, who was a few feet away and listening to the exchange between the women at the door, testified that he never heard his mother make such a comment and that he would have been extremely embarrassed if she had.

That evening Barbara Aylett told her husband that Ms. Burris had stopped by and that she completed Ms. Burris' subsidy forms, to which Mr. Aylett responded "okay." She further mentioned that she and Ms. Burris attended the same high school and that Ms. Burris would be a fine tenant. She also communicated the fact that Ms. Burris was black.

Bobbie Burris delivered the completed papers to the Salt Lake County Housing Authority the next day and arranged for an inspection of the unit by the Housing Authority on September 6, 1990. The apartment required considerable repairs and eventually failed the HUD inspection. Ms. Burris notified Mr. Aylett and asked him to make the necessary repairs.

Shortly thereafter, Joe Trujillo, an Hispanic man, and his girlfriend, stopped by to view the unit. They offered to clean and repair the apartment in exchange for a reduction in the requested deposit from $200 to $100.

Mr. Aylett agreed, and Mr. Trujillo gave him a check for $100. When Ms. Burris called Mr. Aylett on September 9, 1990 to ask if he would waive the deposit if she cleaned the unit, he informed her that the unit had been rented.

Three days later, On September 12, Ms. Burris filed a complaint with HUD, naming Jess Aylett and his son Justin Memmott (Mr. Memmott was the owner of record, although the quitclaim deed from his father was never delivered) as respondents. HUD investigator Jeffrey Frant was assigned to investigate the case and interviewed Ms. Burris, her daughter, and Jess and Barbara Aylett. He did not interview Justin Memmott, although he was aware that Mr. Memmott was a named respondent and witness to the alleged statement by Ms. Aylett to Mr. Burris.

## II.

A hearing before an ALJ was held on January 27, 1993 and, on May 24, 1993, the ALJ issued the Initial Decision dismissing all charges against the Ayletts. The ALJ found Justin Memmott to be the "most credible witness" and "the only eyewitness to the conversation":

> Based on my observation of his demeanor, I found him to be very frank and sincere. Despite the fact that he is a Respondent and Ms. Aylett's son, I found his testimony to be very convincing. Thus, I place great weight on his eyewitness testimony that Ms. Aylett did not make the alleged statement.

Initial Decision & Order at 4–5. The ALJ further found Barbara Aylett's testimony to be "credible" and stated: "Based on my observation of Ms. Aylett's demeanor, I found her testimony to be very sincere." *Id.* at 5. Finally, the ALJ concluded that "based on my observation of [Jess Aylett's] demeanor, I found him to be very believable." *Id.*

Although the ALJ did not find Bobbie Burris and her daughter to be incredible, he determined that their testimony was "simply not more believable than that of Ms. Aylett and Mr. Memmott." *Id.*[1] The ALJ conclud-

---

1. Ms. Burris' daughter was not in the house and did not hear the statement. Ms. Burris testified that she later told her daughter about the incident.

ed that "the preponderance of the evidence does not show [that the Ayletts were biased against black persons], or that Ms. Aylett had any reason to believe that her husband would never rent to Black persons." *Id.*

Specifically, the ALJ found that Jess Aylett did not tell his wife that he would never rent to black persons. He determined that Mr. Aylett rented to at least two black couples and one black single mother in the past, that although he had to evict 10 tenants for causing problems he never evicted a black tenant, that he rented to two white women who had black men living with them, that he and his wife shared a duplex for some time with a black couple and that he employed and continues to employ non-caucasian persons. *Id.* at 5–6.

The ALJ further found that Ms. Aylett welcomed Ms. Burris into her home and spent 30 minutes filling out the rent subsidy documents even though she had never completed such forms for a prospective tenant, that when she told her husband that she completed the forms for Ms. Burris and that she would make a good tenant, her husband responded "okay," and that she assumed the unit had been rented to Ms. Burris and told Mr. Trujillo that it was rented when he first inquired. In addition, the ALJ found that Mr. Aylett told Ms. Burris about the deposit requirement before he knew she was black, that he wasted no time in scheduling an inspection of the unit, and that three days after inspection he received an offer to take the unit "as is" in exchange for reduced deposit. *Id.* at 6–7.

Finally, the ALJ found that any psychological problems Ms. Burris might have had as a result of this incident did not result from the alleged statement but rather from her inability to rent the unit and find satisfactory housing. *Id.* at 8.

An appeal from the ALJ's decision was taken to the Secretary. In many administrative agencies, reviews of ALJ decisions are considered by a multi-person board or commission. *See, e.g.,* 20 C.F.R. 404.900(a)(4) (in disputes arising under the Social Security Act, the Appeals Council is the final administrative decision-making body); 20 C.F.R. § 725.481 (in disputes arising under the Federal Coal Mine Health & Safety Act, parties may appeal ALJ decision to Benefits Review Board); 29 C.F.R. § 101.12 (in labor disputes, the National Labor Relations Board reviews decisions of the ALJ). This is similar to federal court practices where three circuit judges on the U.S. Courts of Appeals review judgments entered by district judges. The practice in the U.S. Department of Housing and Urban Development is different. A single person considers the appeals. *See, e.g.,* 24 C.F.R. §§ 24.314(c), 26.25(c), 104.930(a) (hearing officer's determination final unless Secretary or designee decides as a matter of discretion to review finding). In this case, Bruce Katz, identified as "Secretarial Designee," constituted a one-person reviewing tribunal.

In accordance with the Fair Housing Act, 42 U.S.C. § 3216(h) and pursuant to 24 C.F.R. § 104.930(a), "[t]he Secretary of HUD may review any finding of fact, conclusion of law, or order contained in the initial decision of the administrative judge and issue a final decision in the proceeding. The Secretary may affirm, modify or set aside, in whole or in part, the initial decision or remand the initial decision for further proceedings."

On June 23, 1993, Katz vacated the Initial Decision because "it was error for the ALJ to admit the investigator's report into evidence without giving the ALJ or the parties the opportunity to hear the investigator's live testimony." Order on Secretarial Review at 7. The Remand Order instructed the ALJ to "allow the testimony of Jeffrey Frant, the Department's investigator in the instant case and to reevaluate the credibility of the witnesses after hearing Mr. Frant's testimony." *Id.*

### III.

The ALJ held a second hearing on July 20, 1993 to take the testimony of Frant. Mr. Frant testified that he could remember nothing about his interview with the Ayletts or about how he took his original raw notes, from which his final notes were prepared days later. The raw notes were entered as an exhibit in the initial hearing:

CPL [Ms. Burris] stayed for a long time, partly because R–wife [Ms. Aylett] & CPL discovered that they were both in the class of 1969 at West High School in SLC [Salt Lake City]. They talked about mutual acquaintances in H.S. They talked about R–wife's experience as a landlord in West Valley City. CPL wanted to know if R's [Respondents] would rent to Blacks. How they would feel about renting to Blacks. CPL said she had searched extensively for a good unit and had looked at a lot of places, mostly dumps. She was very excited about the high quality and amenities of R's 3BR unit. R–wife said that once they had a place that was bug-infested, because of the renters, who were Black; that most of the Blacks R has rented to were from "back East," not from "around here" and that they were different, from Ghettos, bringing with them more problems. Some trashed their places. R–wife stated that, although they have had problems with Blacks in the past, [that] wouldn't affect R's decision whether to rent to CPL. CPL said that she would be an excellent tenant. R–wife told CPL that, "Yes, we've rented to many Blacks in the past." R–wife stated that her husband had not been around Blacks much. R–wife assure[d] CPL that it would be no problem; that she would given CPL a high recommendation because she had gone to school with CPL. R–wife speculated that CPL took what was said out of context and misconstrued it. R–wife denies saying anything about her husband never renting to Blacks.

Initial Decision & Order on Remand at 6.

Mr. Frant testified that he could not recall if Ms. Aylett used the words "bug-infested" and "Ghetto," or if she stated that some black tenants "trash their places," although he confirmed that he normally puts quotation marks around words he is "absolutely certain" a person said. Certain phrases such as "bug-infested" and "some trash their places" were absent from Mr. Frant's Final Investigative Report of the incident. In addition, Mr. Frant conceded that it was possible that the words ascribed to Barbara Aylett could have come from the notes of an interview he conducted with Bobbie Burris the next day. To justify his failure to interview Justin Memmott on whether his mother made the alleged discriminatory statement, Mr. Frant stated that "the whole investigation didn't focus on trying to find out whether or not she did or didn't say it" and, more tellingly, he admitted that he "never really was able to definitively pin down or come to a definitive decision as to whether or not she said it or she didn't say it."

The ALJ issued his Remand Decision on October 21, 1993, again dismissing all charges against Jess and Barbara Aylett and their son, Justin Memmott. Specifically, the ALJ found that Barbara Aylett consistently and credibly denied making any statements that were discriminatory, that Frant's recollection of his interviews was "extremely limited" as he had "virtually no memory of the statements of the witnesses" and "did not recall anything that was said during his interview with the Ayletts," that Frant's final notes were adopted from his raw notes days after the interview, that the narrative in the report is in Frant's own words and not that of the Ayletts, and that Frant did not place quotation marks around any of the discriminatory statements in his report as is his custom when he is certain a declarant has said something. Initial Decision & Order on Remand at 6–10. The ALJ further noted that Frant failed to interview Justin Memmott, the only other witness to the allegedly discriminatory statement about Jess Aylett's refusal to rent to blacks, and found that Ms. Burris' failure to testify about statements regarding "Ghettos," "bug-infested" apartments and black tenants "trashing their places" lends support to Ms. Aylett's contention that such things were not said. *Id.*

Based on these and other findings, the ALJ concluded: "No evidence was presented that persuaded me to change my credibility findings." *Id.* at 11 n. 6. Moreover, he stated: "I would find that the eyewitness testimony of Mr. Memmott that she did not make those statements is an insurmountable obstacle to the Government's effort to meet it burden of proof." *Id.* at 17. The department again took an appeal and again Mr. Katz served as the sole reviewing officer for the Secretary. On November 19, 1993, he again reversed the ALJ.

Katz reversed the credibility findings of the ALJ, thus bringing into play the "heightened scrutiny" test of *Fierro*, as opposed to the garden variety "substantial evidence" standard of judicial review applicable to most final administrative orders. Upon review of the cold record, and on the basis of his new credibility findings, Katz concluded:

[T]he Charging party and the Complainant–Intervenor have established by a preponderance of the evidence that ... Mrs. Barbara Aylett told Ms. Burris that her husband would never rent to Black people but that Ms. Aylett would recommend her. These statements constitute a violation of Sections 804(b) and 804(c) of the Fair Housing Act.

Decision & Order at 20.

He stated that "Mr. Frant's notes are entitled to great weight while Mr. Memmott's testimony is of little, if any, probative value." *Id.* He reasoned as follows:

The investigator's notes show that Ms. Aylett made racially-charged statements to the investigator. This suggests, at least to some extent, bias against African–Americans on her part. More importantly, the notes are circumstantial evidence that Ms. Aylett had a reason to believe, at the time that she met with Ms. Burris, that because of a previous bad experience with a former Black tenant, her husband would not rent to Black people....

This case involves whether or not certain statements were made to the Complainant. As in most similar situations, the two parties to the conversation in question have testified in direct conflict with each other as to the crucial statements, even though their testimony coincides on other parts of their conversation. In dismissing the charges, the ALJ found that Mr. Memmott's testimony was an "insurmountable obstacle" to the Charging Party's case. However, the evidence in this case establishes that the ALJ placed far too much weight on Mr. Memmott's testimony.

First, there are questions about what Mr. Memmott in fact heard during the exchange between Ms. Aylett and Ms. Burris at the door. He acknowledged that he was not paying close attention to the conversa-

tion. (T. 236) Despite the fact that he said that he was present and listening during the majority of the conversation, he did not recall either Ms. Burris asking whether the Ayletts' rented to Blacks or his mother's response, both of which Ms. Aylett testified about. He did not recall the racial references that his mother admitted making, about renting to Blacks from "back East." If Mr. Memmott could not recall the racially related statements that his mother *admitted* making, the fact that he did not recall Ms. Aylett making the statement at issue in this case—at the very same time and place as the other statements he did not recall—is of little, if any, probative value.

Moreover, the ALJ did not place enough significance on the fact that it is clear that, as a Respondent, Mr. Memmott has a personal stake in the outcome of this litigation. He also has a personal and financial interest in exonerating his parents in this action....

Based on the evidence of record, I find that Mr. Memmott's testimony is not entitled to the great weight that it was accorded by the ALJ.

*Id.* at 18–19.

Acting as the designee of the Secretary, Katz (who also holds the title of Chief-of-Staff to the Secretary) then vacated and remanded to the ALJ for consideration of whether Barbara Aylett was acting as the agent of Jess Aylett or Justin Memmott when the statements were made and, if so, for a calculation of damages.

On second remand, in accordance with the Katz finding that Barbara Aylett had made the statements, the ALJ concluded that she made them as agent for her husband Jess Aylett. The ALJ then followed the direction of the Secretary and awarded Ms. Burris $80,000 for emotional distress and $15,600 for psychological treatment. Initial Decision & Order on Second Remand at 17–18. He imposed penalties in the amount of $4,000 against Jess Aylett and $500 against Barbara Aylett, as well as certain injunctive relief. *Id.* at 18–20. On February 4, 1994, the

Secretary affirmed the ALJ's decision. This petition for review followed.

## IV.

The petitioners contend that the Secretary erred in reversing the credibility determinations of the ALJ, that the compensatory damages awarded and civil penalties imposed were excessive and that Section 3604(c) of the Fair Housing Act is unconstitutional on its face or as applied to them. It is necessary to address only the petitioners' first contention.

It is useful first to trace the jurisprudence of our court's "heightened scrutiny" test of *Fierro* in order to understand how to apply it:

> [W]here the Secretary, acting through the Appeals Council, overturns a decision of the ALJ granting benefits, and, in so doing, differs with the ALJ's assessment of witness credibility, the Secretary should fully articulate his reasons for so doing, and then, with heightened scrutiny, we must decide whether such reasons find support in the record. *Webber v. Secretary,* 784 F.2d 293, 296 (8th Cir.1986); *Howard v. Heckler,* 782 F.2d [1484,] 1487 [ (9th Cir.1986) ]; *Lopez–Cardona v. Secretary,* 747 F.2d [1081,] 1084 [ (1st Cir. 1984) ].

798 F.2d at 1355.

In *Webber,* 784 F.2d at 296–97, we are told that "[t]he rationale behind this heightened scrutiny is that 'evidence supporting a conclusion may be less substantial when [an agency reaches a decision contrary to that reached by] an impartial, experienced examiner who has observed the witnesses and lived with the case.' *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456 (1951)." *See also Howard,* 782 F.2d at 1487 and cases collected in *Eastern Engineering & Elevator Co., Inc. v. NLRB,* 637 F.2d 191, 197 n. 8 (3d Cir. 1980). Chief Judge Wallace of the Court of Appeals for the Ninth Circuit observed that these decisions often distinguish credibility determinations based on demeanor, sometimes referred to as "testimonial inferences," and inferences drawn from the evidence it-self, sometimes referred to as "derivative inferences." *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1078 (9th Cir.1977) (Wallace, J. opinion announcing the judgment of the court). Weight is given the ALJ's determinations of credibility because only the ALJ "sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records." *NLRB v. Walton Manufacturing Co.,* 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962) (per curiam).

The Court also teaches:

> As we said in the *Universal Camera* case:
>> ". . . The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his [or her] report, of course, depends largely on the importance of credibility in the particular case." 340 U.S., at 496 [71 S.Ct., at 468].
>
> For the demeanor of a witness
>> ". . . may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies." *Dyer v. MacDougall,* 201 F.2d 265, 269 [ (2d Cir.1952) ].

*Walton Mfg. Co.,* 369 U.S. at 408, 82 S.Ct. at 855. In the context of reviewing facts found by a trial judge:

> If . . . the witness testified orally (i.e., in the trial judge's presence) then the trial judge's "testimonial" or "primary" inference must usually be accepted by the upper court. That is the usual rule because of the importance attached to the witnesses' demeanor in estimating credibility; the demeanor is regarded as a sort of "real evidence." Absent documentary evidence . . . his discretion in making "testimonial" or "primary" inferences is virtually unreviewable.

*Wabash Corp. v. Ross Elec. Corp.,* 187 F.2d 577, 601 (2d Cir.1951) (Appendix to dissent-

ing opinion of Frank, J.), *cert. denied,* 342 U.S. 820, 72 S.Ct. 38, 96 L.Ed. 620 (1951). Although Judge Frank's explanation comes in the context of judicial review of a trial judge's findings and not that of an administrative agency, we deem it relevant to our foregoing reference to the Court's discussion of demeanor in the context of an agency's fact finding. *See Walton Mfg. Co.,* 369 U.S. at 408, 82 S.Ct. at 855.

It is against this background that we must examine the reasons given by Secretarial Designee Katz for rejecting the credibility findings of the ALJ "and then, with heightened scrutiny, we must decide whether such reasons find support in the record." *Fierro* 798 F.2d at 1355.

### V.

■ Because heightened scrutiny requires an analysis of the reasoning process of an administrative review that rejects a hearing officer's credibility findings, it is necessary to remind ourselves of some elementary, yet indispensable, concepts of the logical process in adjudication. Involved in the judicial process is an interrelationship among four terms that sound alike, but whose meanings diverge in the decisional process: "reasonable," "reasoning," "reasons" and "reason."

A judge's decision on the choice, interpretation and application of a legal precept involves a value judgment justifiable in his or her mind because the decision is "reasonable," in the sense that it is fair, just, sound and sensible. One judge may believe that it is "reasonable" to maintain the law in harmony with existing circumstances and precedents, and accede to the magnetic appeal of consistency in the law; another may assert that the issue should be considered pragmatically, and will respond only to its practical consequences. What is "reasonable" in given circumstances may permit endless differences of opinion. And this is how it should be. The inevitable varying views found in multi-person reviewing agencies or courts is one of the most vitalizing traditions animating the growth of common law.

Determining what is "reasonable" is closely related to the overarching process we call "reasoning," a progression of thought based upon the logical relation between truths. Logical thought is reflective thinking, which may be understood as an "operation in which present facts suggest other facts (or truths) in such a way as to induce belief in what is suggested on the ground of real relation in the things themselves, a relation between what suggests and what is suggested."[2] Reasoning involves recognizing a "link in actual things, that makes one thing the ground, warrant, evidence, for believing in something else."[3] The ability to adjudicate cases—or in this instance, to review a decision of a tribunal inferior in the administrative agency hierarchy—depends upon the power to see logical connections in the cases, to recognize similarities and dissimilarities. This means solving a problem by pondering a given set of facts to perceive the relationship among those facts and reaching a logical conclusion.

In this process we resort to "reasons," which constitute the various premises utilized in the reasoning process. In the judicial review process, deductive reasoning is the centerpiece: "Reasons" constitute the major and minor premises of the categorical syllogism.

Finally, "reason" is often used as a shorthand expression involving an inquiry into the validity or cogency of "reasoning" and the truth of the factual component of "reasons." The application of "reasonableness" to "reason" is an ever-recurring scenario.

As judges of a trial tribunal or as reviewing judges or agency officials, we can always appraise a specific argument from the sole vantage of its reasoning to determine whether it is, in the language of the logician, valid or cogent, without at the same time troubling ourselves over the truth and falsity of its premises. Similarly, we can always appraise a specific argument from the sole vantage of the truth and falsity of its premises, without troubling ourselves over the validity or cogency of its reasoning. Whenever we appraise an argument to determine whether we

---

**2.** John Dewey, *How We Think* 12 (2d ed. 1933) (emphasis omitted).

**3.** *Id.*

ought to accept it and its conclusion, we must do both of these things. Arguments that have both valid or cogent reasoning and true premises are sound arguments. Thus, an argument fails to be sound if either (a) the reasoning it employs from premises to conclusion is not acceptable, or (b) one or more of its premises is false.

■ We conclude that the reasons stated by the Secretarial Designee in rejecting the credibility findings of the ALJ in this case are woefully deficient. In some instances, without troubling ourselves over the truth or falsity of the premises utilized, his reasoning is neither valid nor cogent, and constitute what the logicians describe as a formal fallacy, or a failure to subscribe to the six rules of a categorical syllogism.[4] In other instances, the factual content of his premises find no support in the record and hence must be regarded as false or untrue. We now proceed to discuss in detail these failures.

## VI.

It is first necessary to address the Secretarial Designee's statement that "Mr. Frant's notes are entitled to great weight." The weight these notes possess is not disputed, although it is strange that Katz did not credit them when the notes were first presented to him in the first appeal. Their relevance to the critical putative statement by Ms. Aylett to Ms. Burris relating to her husband's policy of renting to blacks, however, must be placed in proper perspective. We are not convinced that Katz did this. For example, he completely ignored the only direct evidence in the notes relating to the critical remark. This was Mr. Frant's statement: "R–wife denies saying anything about her husband never renting to Blacks." Initial Decision & Order on Remand at 6. To say that the notes must be given great weight and then to ignore the exculpatory nature of the only reference to the statement at issue is but one of several lapses in reflective thinking committed by the reviewing officer.

The ALJ found Justin Memmott, the only eyewitness to the crucial Ms. Aylett–Ms. Burris conversation at the door, to be "the most credible witness" and commented:

Based on my observation of his demeanor, I found him to be very frank and sincere. Despite the fact that he is a Respondent and Ms. Aylett's son, I found his testimony to be very convincing. Thus, I place great weight on his eyewitness testimony that Ms. Aylett did not make the alleged statement.

Initial Decision and Order at 4–5.

■ We can therefore say that, inasmuch as this was a credibility determination based in large part on demeanor, this was a "testimonial inference" as distinguished from a "derivative inference," and that "the demeanor is regarded as a sort of 'real evidence.'" *Wabash Corp.*, 187 F.2d at 601. The nature of the inference notwithstanding, on the basis of a cold record and not having had the opportunity of hearing the testimony or observing the witness, the Secretarial Designee found "that Mr. Memmott's testimony is not entitled to the great weight that it was accorded by the ALJ." Decision & Order at 19. He assigned two reasons for rejecting the ALJ's credibility findings. First, although it is undisputed that the conversation between the two women about the Aylett's history of renting to blacks from "back East" took place in the kitchen, the designee suggested that it took place "at the door," and faults Mr. Memmott for not hearing the entire conversation. We cannot accept this reason for rejecting Mr. Memmott's testimony because the rejection was based on an erroneous factual predicate. The premise is false in fact because no witness testified that this particular conversation took place at the door; it took place in the kitchen and Justin Memmott never purported to being present in the kitchen at all times. The reviewing officer's conclusion in this respect does not survive the test of reflective reasoning. In the language of the logicians, the premises of his categorical syllogism leading to his conclusion lack support in the record.

Katz's second logical error is even more egregious. He credited the testimony of Ms. Burris, who had a profound personal financial stake in the outcome of this case, quantified at the final hearing to the tune of $100,-

---

4. *See* Irving Copi, *Introduction to Logic* 217–222 (7th Ed.1986).

000. He then corrected the ALJ for crediting Justin Memmott's testimony because, "as a Respondent, Mr. Memmott has a personal stake in the outcome of this litigation. He also has a personal and financial interest in exonerating his parents in this action." Decision & Order at 18–19. The reviewing officer cannot have it both ways. When it comes to finding credibility, he cannot fault Mr. Memmott, son of a respondent, for having a personal stake because of his relationship to his parents and ignore the personal stake of the intervenor, Ms. Burris. Bruce Katz, the Secretarial Designee, committed the formal fallacy of the undistributed middle. The second of the six rules of the categorical syllogism provides that the middle term (the subject of the major premise and usually the predicate of the minor premise) must be distributed in at least one premise, that is to say, the term must be broad or general: If narrow or particular, it is called "undistributed." It is distributed only when the major and minor terms can be connected though or by means of the middle term, and for the two terms that become part of the conclusion to be reached (minor and major) to be connected though a third, at least one of the two must be related to the whole of the class designated by the third or middle term. Thus, the middle term would be distributed if it were stated: "*All* persons who have a personal stake in litigation are not credible." It is undistributed when it is said, "*some* persons who have a personal stake are not credible." When an undistributed middle term is present, the conclusion cannot be justified: this is the fallacy of the undistributed middle.[5] With respect to this stated reason for rejecting the credibility of Memmott, the reviewing officer's reasons lack formal, valid or cogent logical support.

Still another inquiry into the Designee's logic must be examined. For the purpose of this analysis we assume as true the comments attributed to Ms. Aylett that she and her husband had previously rented to blacks from "back East" and not from "around here," and that they were different in that

they had come from "Ghettos," bringing with them more problems of "trashing their places." It is conceded that these statements, in and of themselves, are not sufficient to constitute a violation of Sections 804(b) and 804(c) of the Fair Housing Act. But the reviewing officer took these statements as a starting point and then leaped to a critical inference. He concluded that "the notes are circumstantial evidence that Ms. Aylett had a reason to believe, at the time that she met with Ms. Burris, that because of a previous bad experience with a former Black tenant, her husband would not rent to Black people." Decision & Order at 18. We note that Katz again had his record facts wrong. It was not "*a* former black tenant." As the HUD investigator reported, Ms. Aylett told Ms. Burris, "Yes, we have rented to *many* blacks in the past." Moreover, the undisputed testimony of Jess Aylett set forth this experience with many black tenants in great detail.

But the critical lapse of logical reasoning was the designee's conclusion that this conversation compelled the inference that Ms. Aylett's husband "would not rent to Black people": "Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from basic circumstantial facts" *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.* 637 F.2d 105, 116 (3d Cir.1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). As Wigmore teaches: "This scholarly tradition, reaching back perhaps to Bacon, stresses that the assessment of inference and probability as to matters of fact inescapably involves the consideration of the relative legitimacy and plausibility of competing hypotheses and generalized statements."[6] The passage from one proposition to another, to what Wigmore described as "proposition, factum probandum,"[7] cannot be mere speculation, intuition or guessing. *See, e.g., Galloway v. United States,* 319 U.S. 372, 386, 63 S.Ct. 1077, 1085, 87 L.Ed. 1458 (1943).

5. Irving Copi, *Introduction to Logic* 219 (7th ed. 1986).

6. 1A Wigmore, *Evidence* § 30 (Tillers rev. 1983).

7. Id. at § 43.

The inference drawn by the reviewing officer in the case before us was a *possibility* not a *probability*. The same datum identified as support for the drawn inference inculpating the Ayletts has the capacity to support another permissible, if not probable, inference exculpating them. If the statements contained in the HUD investigator's notes were to be believed, then an acceptable inference is that Jess Aylett *would* rent to Ms. Burris because she was from Utah and not from "back East." We also must consider the undisputed testimony that although Mr. Aylett had to evict ten tenants for causing problems, he never had to evict any black tenants, that he had rented to two women with black boyfriends who lived with them, that he and his wife once shared a duplex with a black couple and that he had employed and continues to employ non-caucasian persons. This evidence compels inferences totally contrary to that reached by the designee Katz.

The evidence before the reviewing agency leading it to reverse the ALJ's credibility findings and to conclude Jess Aylett stated he would never rent to blacks "is thin at best, if it can be regarded as at all more than speculative." *Galloway* 319 U.S. at 387, 63 S.Ct. at 1085. "Inference is capable of bridging many gaps. But not, in these circumstances, one so wide and deep as this." *Id.* at 386, 63 S.Ct. at 1085.

Accordingly, applying the test of *Fierro* and the teachings of *Universal Camera,*[8] we conclude that adequate valid reasons do not support the Secretary Designee's rejection of the ALJ's credibility findings. We are then left with the ALJ's finding of fact that Jess Aylett did not tell his wife that he would never rent to blacks and that his wife did not make such a statement to Ms. Burris. Katz pinned the whole case on a single statement to the contrary: "[T]he Charging party and the Complainant–Intervenor have established by a preponderance of the evidence that ... Mrs. Barbara Aylett told Ms. Burris that her husband would never rent to Black People.... These statements constitute a violation of Sections 804(b) and 804(c) of the Fair Housing Act." Decision & Order at 20.

The other alleged statements regarding the Aylett's past experiences renting to blacks from "back East" were not considered dispositive in this case. Indeed, at oral argument Ms. Burris' counsel stated, "But for this statement [that Mr. Aylett would never rent to black persons], Ms. Burris would not have sustained the damage she sustained." Without a finding that such a statement was made, there is no case against the petitioners.

### VII.

The petition for review will be **GRANTED** and the Secretary is DIRECTED to DISMISS the charges against the petitioners.

---

**8.** We have applied the heightened scrutiny test of *Fierro* and its precursors, but we note that in each of these cases the reviewing administrative authority was a multi-person body. We do not meet in this case whether a more strict standard should be employed where, as here, a single person examining a cold record rejects the credibility findings of a hearing officer who credits testimony based on demeanor of a witness as described in *Walton Mfg.*, 369 U.S. at 408, 82 S.Ct. at 855.