# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 4, 2014          Decided July 14, 2015

No. 13-1198

JAMES HARRY GRIER AND MANTUA GARDENS EAST, INC.,
PETITIONERS

v.

UNITED STATES DEPARTMENT OF HOUSING & URBAN
DEVELOPMENT,
RESPONDENT

On Petition for Review of an Order of the
Department of Housing & Urban Development

*James A. Bell* argued the cause for petitioners. On the briefs was *Jennifer C. Bell*.

*Imran R. Zaidi*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *Stuart F. Delery*, Assistant Attorney General, and *Michael Jay Singer*, Attorney.

Before: BROWN, *Circuit Judge*, and WILLIAMS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Petitioners were found liable by an Administrative Law Judge for violations of laws governing programs administered by the U.S. Department of Housing and Urban Development. The ALJ imposed penalties. The petitioners appealed to the Secretary of HUD. The Secretary upheld the ALJ's liability determinations but imposed higher penalty amounts. In petitioning this court for review, petitioners contend that the Secretary's liability determinations and penalty amounts are arbitrary, capricious, and not supported by substantial evidence. For the reasons stated below, we deny the petition for review.

## I. Background

This case concerns two programs of the U.S. Department of Housing and Urban Development (HUD). One is the Section 236 program of the National Housing Act, 12 U.S.C. § 1715z-1, pursuant to which the Federal Housing Administration (FHA) insures loans to private developers in exchange for their commitment to provide low-income housing. As part of the Section 236 program, HUD also provides interest-reduction payments to FHA-approved mortgagees on behalf of the mortgagors. In exchange for these benefits, the mortgagor executes a Regulatory Agreement that requires the mortgagor to operate the project in accordance with various programmatic and contractual obligations. The second program is the Section 8 Housing Choice Voucher Program of the United States Housing Act, 42 U.S.C. § 1437f. Pursuant to Section 8, HUD subsidizes low-income tenants' rents by making rental subsidy payments to participating project owners on behalf of those tenants. In exchange for this financial assistance, project owners execute a Housing Assistance Payment (HAP) contract that requires, *inter alia*, owners to provide HUD and affected tenants at least one year's notice before terminating the contract.

Mantua Gardens East Project ("Mantua Project") is a 52-unit housing complex located in Philadelphia. The complex is owned by petitioner Mantua Gardens East, Inc. ("Mantua Gardens"), whose president and board chairman is petitioner James Grier ("Grier"). In 1970, Mantua Gardens obtained a mortgage from Firstrust Bank ("Firstrust"), an FHA-approved lender. The mortgage was secured as part of HUD's Section 236 program. The maturity date was May 1, 2012. Mantua Gardens entered into a Regulatory Agreement with HUD to ensure Mantua Gardens would provide and maintain affordable housing. Subsequently, in 1983, Mantua Gardens entered into a Section 8 HAP contract with HUD.

In January 2008, Grier sent a letter to Firstrust requesting that the bank deposit $325,000 from Mantua Gardens' reserve account into an account at Wachovia Bank. The next month, Grier formed Mantua Gardens East, LLC. Mantua Gardens East, LLC, subsequently secured a loan from Wachovia, using the $325,000 deposited in January as collateral. Grier, acting as managing member of Mantua Gardens East, LLC, then used the loan to send a check to Firstrust "in full payment" of the original 1970 mortgage. In 2011, apparently believing that HUD statutory and regulatory requirements now no longer pertained to the Mantua Project because of the mortgage transfer, Mantua Gardens and Grier issued a notice to all of their subsidized tenants stating that they would have to sign new leases and pay new rents. Soon thereafter, Mantua Gardens and Grier began issuing vacate notices to subsidized tenants.

In 2012 HUD filed a complaint with its Office of Hearing and Appeals against Mantua Gardens and Grier. The complaint sought civil money penalties for violations of the provisions governing Section 236 and Section 8 programs, in particular concerning the new leases and rent notices as well as the notices to vacate. The complaint sought $212,500 against Mantua

Gardens and Grier jointly and severally, for violation of the requirements of the Section 236 program, and $1,260,000 solely against Mantua Gardens for violation of the requirements of the Section 8 program. In 2013, the Administrative Law Judge assigned to the case found Mantua Gardens and Grier liable for violating their HUD statutory, regulatory, and contractual obligations. *In re Mantua Gardens East, Inc.*, HUDALJ 12-F-043-CMP-3, 2013 WL 663168 (Feb. 1, 2013). The ALJ found that Mantua Gardens and Grier deserved the maximum penalties, resulting in total liability of $262,500 jointly and severally, and $2,325,000 for Mantua Gardens. However, the ALJ observed that the governing regulations provided for consideration of "ability to pay" in the determination of penalty amounts. *Id.* at 11; *see* 24 C.F.R. § 30.80(c). After considering that regulatory factor, the ALJ determined that Mantua Gardens, instead of $2,325,000, could reasonably pay a penalty of only $450,000. *Mantua Gardens*, 2013 WL 663168, at *19-20. The ALJ also determined that under another regulatory factor, "such other matters as justice may require," 25 C.F.R. § 30.80(j), HUD had conducted its penalty analysis in bad faith, *i.e.*, HUD's motivation was to bankrupt Mantua Gardens and Grier, *Mantua Gardens*, 2013 WL 663168, at *21. The ALJ consequently reduced both the $262,500 penalty and the $450,000 penalty by 25%, resulting in final penalties of $196,875 jointly and severally, and $337,500 for Mantua Gardens. *Id.* at *22.

The government filed an appeal of the ALJ's penalty determination. Petitioners filed a cross-appeal of the ALJ's liability determinations. The appeal was made to the Secretary of HUD. Pursuant to 24 C.F.R. § 26.52(k), the Secretary may "affirm, modify, reduce, reverse, compromise, remand, or settle any relief granted in the initial decision." The Secretary issued a decision upholding the liability determinations but modifying the penalty amounts. *In re Mantua Gardens, Inc.*, HUDALJ 12-F-043-CMP-3 (May 28, 2013) (hereinafter "Sec'y's Op."),

Supp. JA 1.  First, the Secretary vacated the ALJ's reduction of the joint and several penalty, restoring it to $262,500 as originally imposed by the ALJ.  Second, the Secretary vacated the ALJ's reductions of Mantua Gardens' penalty, restoring it to the amount proposed by the government, $1,260,000.

Mantua Gardens and Grier petition for review of the Secretary's decision.

## II.  Discussion

## A.  Jurisdiction

Our first task when presented with any case is determining whether we have jurisdiction.  *See, e.g., Nat'l Treasury Emp. Union v. FLRA*, 754 F.3d 1031, 1038 (D.C. Cir. 2014) ("The first and fundamental question we are bound to ask and answer is whether we have jurisdiction to decide [the] petition for review." (internal quotation marks and citations omitted)). Here, HUD questions our jurisdiction.  Pursuant to 12 U.S.C. § 1735f-15(e), a party seeking judicial review of an order imposing civil money penalties must file a petition in the appropriate court of appeals "within 20 days after the entry of such order or determination."  The statute does not otherwise define "entry," its meaning is not self-evident, and we have had no occasion to address the issue.  HUD argues that here we should consider the date of entry to be the date of the Secretary's order imposing civil money penalties, May 28, 2013.  HUD further argues that the 20-day period for filing a petition for review expired on June 17, 2013.  Since the petitioners did not file their petition until one day later, *i.e.*, June 18, 2013, HUD contends that the petition was late and therefore this court lacks jurisdiction to review it.  *See Bowles v. Russell*, 551 U.S. 205, 209 (2007) ("the taking of an appeal within the prescribed time limit is mandatory and jurisdictional.") (internal quotation marks

and citations omitted). While we note that "*Bowles* did not hold categorically that every deadline for seeking judicial review and civil litigation is jurisdictional," *Henderson v. Shinseki*, 562 U.S. 428, 436 (2011), we will assume *arguendo* that it is under this statute, as in the end it matters not at all, as we would have jurisdiction even applying that theory.

In response, petitioners point to the date on the Certificate of Service[*], May 29, 2013, *i.e.*, one day after the date of the Secretary's order. They argue that this date should be the date on which the "entry" of the Secretary's order was made, and consequently the petition for review was timely filed. In support of their position, petitioners cite our decision in *Energy Probe v. U.S. Nuclear Regulatory Comm'n*, 872 F.2d 436 (D.C. Cir. 1989). In that case, we noted that pursuant to the Hobbs Act, 28 U.S.C. § 2341 *et seq.*, a party may appeal a final order of the Nuclear Regulatory Commission (NRC) within 60 days of the "entry" of the final order. We held that under the Hobbs Act, "the date of 'entry' . . . is the date on which the agency's final decision is signed and *served*." 872 F.2d at 438 (emphasis added). Petitioners argue that in this case, although the order itself was signed on May 28, 2013, the date they were "served" was the date of the Certificate of Service, *i.e.*, May 29, 2013, and consequently that date should be the date on which the 20-day time limit commenced.

HUD, in support of its contrary argument that the date of "entry" here should be the date of the Secretary's order, and not the date of the Certificate of Service, relies on an Eighth Circuit case, *U.S. Dep't of Agric. v. Kelly*, 38 F.3d 999 (8th Cir. 1994). *Kelly* involved an order of the Secretary of the USDA issued

---

[*]The Certificate of Service was not included in any submissions to the court. At oral argument the parties agreed that the date on the Certificate of Service was May 29, 2013.

pursuant to the Horse Protection Act, 15 U.S.C. § 1821 *et seq.* The Secretary's order was dated a day earlier than the order was mailed/served.  If the date commencing the time limit of the notice of appeal was the date of the order, then Kelly's appeal was untimely; if instead the date of commencement was the next day, when the order was mailed/served, then the appeal was timely.  Kelly argued that the court should follow our decision in *Energy Probe* and use the date of service as the commencement date.  The Eighth Circuit rejected that argument, noting that the Horse Protection Act was clear on its face that an appeal must be filed "'within 30 days from the *date of such order.*'" *Kelly*, 38 F.3d at 1001 (quoting 15 U.S.C. § 1825(b)(2)) (emphasis added).  The court consequently held that under the Horse Protection Act the commencement time limit for filing an appeal "begins on the date of the order, not the date on which service is mailed." *Id.* at 1002.  HUD argues that likewise here the date of the Secretary's order should be the date on which the 20-day time limit for filing an appeal begins.

We do not find HUD's argument persuasive.  First, we do not consider *Kelly* helpful.  In that case, the statute specifically referred to the date of the order as the date for commencing the filing-of-an-appeal time limit.  Here, the statute refers only to the "entry" of the order.  The order date and the day entry of the order is made may be one and the same, but not necessarily.  Second, HUD's contention that "entry" occurs when the order is signed is untenable as it would permit an agency to shorten a would-be petitioner's review period by delaying service of a signed order.  Instead, we find helpful our holding in *Energy Probe*.  In that case the relevant document was signed on a certain date and stamped "served."  872 F.2d at 437.  As noted above, we held that under the Hobbs Act the date of "entry" "is the date on which the agency's final decision is signed and served." *Id.* at 438.  In the present case, the agency's final decision was not "signed *and served*" until the certificate of

service on May 29. Following the clear guidance of *Energy Probe*, we hold that Petitioners' petition filed on June 18, 2003, was therefore within the 20-day time limit which commenced on May 29, 2013, the date of the Certificate of Service. Therefore, this petition is within our jurisdiction.

## B. Standard of Review

We may set aside the Secretary's decision only if it is not supported by substantial evidence or if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) and (E).

## C. Merits

### 1. Liability for Section 8 Violations

Pursuant to HAP and statutory requirements, a property owner may not, *inter alia*, increase Section 8 tenants' rents without giving those tenants and HUD one year's notice of the proposed termination of a HAP contract. Nevertheless, in September 2011, Mantua Gardens sent notices to all of its Section 8 tenants informing them that they would have to sign new leases and pay new rents. No notice was given to either HUD or the tenants of any proposal to terminate the HAP contract. The ALJ and the Secretary found that this conduct by Mantua Gardens violated 42 U.S.C. § 1437f(c)(8)(B), and imposed penalties. Mantua Gardens argues, as it did before the agency, that at the time of its alleged violations of the Section 8 program, there was no HAP contract in place to violate because the contract had expired and had not yet been replaced with a new contract. Mantua Gardens asserts that consequently the Secretary's finding of liability for violations of the Section 8 program was arbitrary and capricious and not supported by substantial evidence. But as the Secretary explained, not only

is the prohibition on raising rents before notice is given a contractual obligation in the HAP contract, it is also a statutory requirement, *see* 42 U.S.C. § 1437f(c)(8)(B), that Mantua Gardens was obligated to follow as a Section 8 property owner. Mantua Gardens violated this obligation, and Mantua Gardens has given us no reason to disturb the Secretary's finding of Section 8 violations by Mantua Gardens.

## 2. Penalty for Section 8 Violations

In its Complaint, HUD sought $1,260,000 against Mantua Gardens for its Section 8 violations. After finding that Mantua Gardens violated the requirements of the Section 8 program, the ALJ initially concluded that the penalty should be $2,325,000. *Mantua Gardens*, 2013 WL 663168, at *20. But after considering the "ability to pay" factor set forth in 24 C.F.R. § 30.80 as a requirement to be considered when determining a penalty amount, the ALJ reduced the penalty to $450,000. This amount, according to the ALJ, was the most Mantua Gardens could reasonably be expected to pay and still stay in business. The ALJ noted that Mantua Gardens introduced no evidence to show the lack of an ability to pay the higher penalty amount. *Id.* at *19–*20. The Secretary reversed the ALJ's penalty reduction, imposing instead the original amount sought by HUD, $1,260,000. Pursuant to 24 C.F.R. §§ 30.75(b) and 30.80(c), the Secretary explained, the ability to pay a penalty is presumed unless it is raised as an affirmative defense and documentary evidence is provided. The Secretary noted that in this instance no evidence was presented showing Mantua Gardens' ability to pay any penalty amount. Sec'y's Op. at 8–9, Supp. JA 8–9.

Mantua Gardens argues that the Secretary's reversal of the ALJ's $450,000 penalty was arbitrary and capricious and not supported by substantial evidence. According to Mantua Gardens, its financial health and inability to pay the $1,260,000

penalty requested by HUD was known to all parties and decision-makers. It was clear from the evidence, Mantua Gardens argues, that it did not have money, did not have sufficient income, and did not have the ability to borrow. But in fact the ALJ found that Mantua Gardens introduced no evidence whatsoever to substantiate its claim of financial vulnerability. *Mantua Gardens*, 2013 WL 663168, at \*19. As the Secretary noted, under the regulations an ability to pay is presumed unless a party raises it as an affirmative defense and provides documentary evidence. Sec'y's Op. at 8–9, Supp. JA 8–9. Since Mantua Gardens presented nothing to suggest that it could not pay HUD's requested penalty, we have no basis to disturb the Secretary's decision.

### 3. Liability for Section 236 Violations

In January 2008, Grier requested that Firstrust, mortgagee of the property, deposit $325,000 from Mantua Gardens' reserve account into an account at Wachovia Bank. The next month, Grier formed Mantua Gardens East, LLC. Mantua Gardens East, LLC, then secured a loan from Wachovia Bank, using the $325,000 deposited in January as collateral. Grier, acting as managing member of Mantua Gardens East, LLC, subsequently used the loan to send a check to Firstrust "in full payment" of the original mortgage. Apparently Grier believed that HUD statutory and regulatory requirements no longer pertained to the Mantua Project, and proceeded accordingly. Because of Grier's actions, HUD in its Complaint charged Grier and Mantua Gardens with encumbering the rents of the property via the loan with Wachovia; encumbering the project's real property via the same Wachovia loan; withdrawing money from the project's reserve fund without HUD's permission; firing the project manager without HUD's approval; and failing to provide HUD adequate financial disclosure reports for the project. The ALJ found that Grier and Mantua Gardens committed these

violations, and the Secretary agreed. *See Mantua Gardens*, 2013 WL 663168, at \*11–\*16; Sec'y's Op. at 3–8, Supp. JA 3–8.

Mantua Gardens and Grier argue that the Secretary's finding of liability for violations of the Section 236 program was arbitrary and capricious and not supported by substantial evidence. They claim that no violations by them can be found after February 25, 2008, because that was the date on which the mortgage on Mantua Gardens was purchased from Firstrust by Mantua Gardens East, LLC. Mantua Gardens East is not an FHA-approved mortgagee. By transferring the mortgage to Mantua Gardens East, LLC, Mantua Gardens and Grier argue, the mortgage ceased to be insured, co-insured, or held pursuant to the Regulatory Agreement, and therefore liability for violations of the Agreement could no longer attach. Mantua Gardens and Grier further contend that no violations of the Regulatory Agreement by them can be found prior to February 25, 2008, because the transfer of the reserve funds from Firstrust to Wachovia was tacitly approved by Firstrust, and Firstrust had full knowledge that Mantua Gardens intended to use some of that money as collateral for a loan. Noting that Firstrust is an FHA-approved mortgagee subject to HUD oversight and responsible for ensuring compliance with FHA requirements, Mantua Gardens and Grier argue that if anybody is at fault it is Firstrust.

We disagree. The Secretary's decision noted that although the premature cancellation of an insurance contract can be accomplished by prepayment (as Grier and Mantua Gardens attempted here), the Secretary must make a determination that, *inter alia*, the project no longer meets the housing needs of lower income families. *See* 24 C.F.R. § 207.253, 207.253a; 12 U.S.C. § 1715z-15. The Secretary determined that here no request was made for Secretarial approval of a prepayment, and therefore no cancellation of the agreement occurred. Sec'y's

Op. at 4–5, Supp. JA 4–5. We again have no basis to disturb the Secretary's determination.

   4. Penalty Reductions for Section 236 and Section 8 Violations

   After determining that the penalty for Section 8 violations was to be $450,000 and the penalty for Section 236 violations $262,500, the ALJ then reduced both penalties by 25%, to $337,500 and $196,875, respectively. *Mantua Gardens*, 2013 WL 663168, at *22. In making these reductions the ALJ explained that, pursuant to 24 C.F.R. § 30.80, in determining a penalty amount he must weigh, *inter alia*, the factor of "[s]uch other matters as justice may require." In this case, the ALJ stated, testimony from a HUD official showed that HUD had chosen its requested penalty amount of $1,260,000 for the Section 8 violations in an attempt to bankrupt Grier and Mantua Gardens. *Id.* at *11. Consequently, according to the ALJ, HUD had conducted its penalty analysis in bad faith, and justice required the penalty reductions. *Id.* The Secretary, however, vacated the ALJ's 25% reductions, determining that the ALJ misinterpreted the testimony of the HUD official as suggesting that HUD had set out to bankrupt Mantua Gardens and Grier. In the Secretary's view the testimony was not an indication that HUD sought to bankrupt Grier and Mantua Gardens, but instead showed that HUD used the "ability to pay" factor to actually reduce the penalty amount it would be requesting. Sec'y's Op. at 11–13, Supp. JA 11–13. While the ALJ expressed reliance on the entire testimony of the witness, he apparently was specifically interpreting the witness's statement that:

   I think where we came from it was looking at, "Well, what is the property worth?" and the combined amount for the HAP contracts is about what the property may be worth. The idea might be that it would be appropriate to force the

> sale of the property from [petitioners] to another nonprofit to run it in a way that is in accordance with our requirements.

*Mantua Gardens*, 2013 WL 663168, at \*11. The ALJ interpreted this testimony as establishing that HUD had "identified 1.5 million as the proverbial 'knockout blow,'" and therefore, "the Government's initial request of a 1.6 million penalty cannot be considered a 'mere coincidence.'" *Id.*

Mantua Gardens and Grier argue that there is no factual support in the record providing adequate valid reasons to support the Secretary's vacation of the ALJ's 25% reductions. According to them, the ALJ's decision to reduce the penalties by 25% turned on his assessment of witness credibility based on his observation of the testimony. The Secretary, they argue, never explains why the ALJ's opportunity to see the witnesses, to hear them testify, and to observe their demeanor, does not "put the ALJ in the cat bird seat with respect to divining truth." Pet'rs' Br. 25. They cite *Aylett v. Sec'y of HUD*, 54 F.3d 1560, 1566-67 (10th Cir. 1995), for the proposition that the Secretary's decision is subject to "heightened scrutiny" where the Secretary has rejected the ALJ's credibility findings.

We do not find *Aylett* helpful. That case involved witness credibility determinations, and we agree with HUD that here the ALJ's finding of bad faith on the part of HUD was based, not on the ALJ's determination of witness credibility, but on the ALJ's misinterpretation of the testimony of the HUD official. The Secretary and the ALJ did not disagree about the credibility of the HUD official's testimony, but rather the meaning of the testimony. The Secretary's reversal of the ALJ's bad faith finding was based on an interpretation and weight of the evidence. On these points the Secretary owed the ALJ no deference, and given the Secretary's broad discretion, the

Secretary properly determined that HUD conducted an appropriate penalty analysis.

### III.  Conclusion

The petition for review is denied.